# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| LSS SOFTWARE HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> Loren K. Miller, Director of the Nebraska Service Center, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security; <br><br> L. Francis Cissna, in his Official Capacity, Director, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security; <br><br> Kirstjen Nielsen, in her Official Capacity, Secretary, U.S. Department of Homeland Security; <br><br> U.S. Citizenship and Immigration Services; <br><br> U.S. Department of Homeland Security, <br><br> Defendants. | **CIVIL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE ADMINISTRATIVE PROCEDURE ACT** <br><br> Case No. <br> _____ <br> No request for Jury Trial |

## INTRODUCTION

1.     This civil action seeks declaratory and injunctive relief against Loren K.

Miller, Director of the Nebraska Service Center ("NSC"), U.S. Citizenship and

Immigration Services ("USCIS"), U.S. Department of Homeland Security

("DHS"); L. Francis Cissna, Director, USCIS; Kirstjen Nielsen, Secretary, DHS;

USCIS; and DHS (collectively "the Government") under the Administrative and

Procedure Act ("APA"), 5 U.S.C. § 701, *et. seq*.

2.      The Government improperly denied a Form I-140, Petition for Immigrant

Petition for Alien Worker, filed by Plaintiff, LSS SOFTWARE HOLDINGS, INC.,

("LSS Software"), a multinational technology company on behalf of its founder

and Chief Executive Officer, Mr. Bjorn Larsen ("Mr. Larsen"), seeking to

permanently employ him under the first preference immigrant classification as a

multinational executive or manager.  *See* Section 203(b)(1)(C) of the Immigration

and Nationality Act ("INA"), 8 U.S.C. § 1153(b)(1)(C).

3.      LSS Software is a wholly-owned subsidiary of Lean Software Services, Inc.,

("Lean Software") a Canadian-based company.  Together, these two entities are

known as Lean Industries and function together to develop and deliver

comprehensive enterprise software solutions to banks and financial institutions in

North America and Europe.

4.      LSS Software has employed Mr. Larsen as an L1-A nonimmigrant in the

position of President and CEO since 2011.  The L1-A classification allows a

company, such as LSS Software, to transfer a qualifying foreign employee to the

United States to work in a managerial or executive capacity.

5.      Despite holding a L1-A nonimmigrant visa to work in the United States for

the plaintiff as an executive or manager since 2011, on December 20, 2018,

Defendants arbitrarily and unlawfully denied the I-140 petition on the basis that

Mr. Larsen did not qualify as an executive or manager and had not primarily performed executive or managerial tasks in either the United States or Canada.

## JURISDICTION

6.     This case arises under INA § 101, 8 U.S.C. § 1101, *et. seq.*, and the APA, 5 U.S.C. § 701, *et. seq.*  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as a civil action arising under the laws of the United States.  This Court also has the authority to grant declaratory relief under 28 U.S.C. §§ 2201-02, and injunctive relief under 5 U.S.C. § 702, and 28 U.S.C. §§ 1361-62.  The United States has waived sovereign immunity under 5 U.S.C. § 702.

7.     Federal courts have jurisdiction to review an employer-sponsors' legal challenges to the denial of visa applications under the APA.  5 U.S.C. § 701; *see, e.g.*, *Tianhai Elec. N. Am., Inc. v. Johnson*, Case No. 14-cv-10016, 2015 U.S. Dist. LEXIS 182586 at *5-6 (E.D. Mich. 2015) (additional citation omitted)

8.     USCIS' decision to deny plaintiff's immigrant visa petition is a final agency decision ripe for judicial review and plaintiff need not have sought an appeal before USCIS' Administrative Appeals Office ("AAO") before invoking the jurisdiction of this Court.  *See, e.g.*, *EG Enters v. DHS*, 467 F. Supp. 2d 728, 732-33 (E.D. Mich. 2006) (recognizing USCIS' concession in a cross-motion that exhaustion of H1-B appeal was not required prior to seeking judicial review); *RCM Technologies, Inc. v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 2d 39, 45 (D.

D.C. 2009) ("[P]laintiffs need not pursue an AAO appeal before seeking judicial review of denied visa applications in federal court.").

## VENUE

9.     Venue is proper before this Court pursuant to 28 U.S.C. § 1391(e) because (1) this is a civil action in which the Defendants are either employees or officers of the United States, acting in their official capacity, or an agency of the United States; (2) a substantial part of the events or omissions giving rise to the claim occurred in this district as plaintiff's headquarters are located in Dayton, Ohio; and (3) there is no real property involved in this action.

## PARTIES

**Plaintiff**

10.     LSS Software is a wholly-owned subsidiary of Lean Software Services ("Lean Software"), a Canadian-based company.  Together, these two entities are known as Lean Industries and develop and deliver comprehensive enterprise software solutions to banks and financial institutions in North America and Europe.  Bjorn Larsen founded Lean Software in 2002, and has served as its only Chief Executive and President.  In 2010, he incorporated LSS Software, which is headquartered in Dayton, Ohio.  As of December 31, 2017, Lean Industries employed 39 individuals (15 in the United States, 22 in Canada, and 2 in Portugal) and generated approximately $5.8 million in sales of its software.

**Defendants**

11.     Defendant Loren K. Miller is the Director of the NSC.  Among other responsibilities, the NSC adjudicates visa petitions filed on behalf of employers, such as immigrant visa petition Plaintiff filed on behalf of Mr. Larsen.  Defendant Loren K. Miller is sued in his official capacity.

12.     Defendant L. Francis Cissna is the Director of USCIS.  As Director, Defendant Cissna directs the administration of USCIS which oversees the issuance of visas along with its responsibility to implement the INA and other immigration-related laws.  Defendant Cissna is responsible for USCIS' policies, practices, and procedures, which includes the delegated personnel who adjudicated plaintiff's visa petition.  Defendant Cissna is sued in his official capacity.

13.     Defendant Kirstjen Nielson is the Secretary of the DHS, the federal agency overseeing many component agencies, including USCIS.  In her official capacity, Defendant Nielson is responsible for the administration and enforcement of the INA and immigration-related laws.  Defendant Nielson is sued in her official capacity.

14.     Defendant USCIS is a component agency of the DHS, and shares responsibility for the implementation of the INA and immigration-related laws of the United States.  USCIS is specifically tasked with the adjudication of immigration benefits, which includes the adjudication of H1-B visa petitions.

15.     Defendant DHS is a cabinet department of the United States federal government overseeing many immigration-based component parts, such as USCIS, Immigration and Customs Enforcement, and Customs and Border Protection.

## LEGAL BACKGROUND

**A:     First Priority Preference Visas for Multinational Executives or Managers:**

16.     "Each year, Congress provides a limited number of visas permitting people to immigrate on the basis of employment needs." *Tianhai*, 2015 U.S. Dist. LEXIS 182586 at *6, *citing Gordon et al., 3 Immigration Law & Procedure § 39.01[1].* The INA allocates a portion of the employment-based visas to "multinational executives and managers." 8 U.S.C. § 1153(b)(1)(C). If an immigrant qualifies as a multinational executive or manager, they are given "first preference benefits as a priority worker." *Gordon et al.*, at § 39.03[4][b].

17.     "Congress's purpose in creating this classification" was "to facilitate the transfer of key managers or executives within a multinational organization." *See Matter of G-, Inc.*, Adopted Decision 2017-05 at *2 (USCIS AAO Nov. 8, 2017);[1]

---

[1]  USCIS designated *Matter of G-, Inc.* as an adopted decision establishing binding policy guidance on all USCIS adjudicators. *See USCIS Policy Memorandum* PM-602-0148 (Nov. 8, 2017), located at https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2017/APPROVED_PM-602-0148_Matter_of_G-_Inc._Adopted_AAO_Decision.pdf

**B.      Statutory and Regulatory Requirements for Multinational Executive or Manager Immigrant Visas – EB-1(C)**

18.      An employer seeking to permanently employ a worker in the "EB-1(C)" category must file a Form I-140 petition with the USCIS on behalf of the intended beneficiary.  8 C.F.R. § 204.5(j)(1). When the employee seeking classification as a multinational executive or manager is already in the United States, as is the case here, the petitioning employer must demonstrate that the employee-beneficiary was employed abroad in the same capacity for the same employer (or for its parent, affiliate, or subsidiary) for at least one year.  *See Matter of G- Inc.*, Adopted Decision 2017-05 at *2; 8 C.F.R. §§ 204.5(j)(3)(i)(B)-(C).

19.      The petitioning employer must further demonstrate that the beneficiary's job will primarily consist of executive or managerial duties.  8 U.S.C. § 1153(b)(1)(C); *see Brazil Quality Stones, Inc. v. Chertoff*, 531 F.3d 1063, 1070 (9th Cir. 2008) (stating that the employee cannot qualify for a visa "simply because he performs managerial tasks" but that "such tasks must encompass his primary responsibilities").  "[T]he prospective employer in the United States must furnish a job offer in the form of a statement which indicates that the alien is to be employed in the United States in a managerial or executive capacity.  Such letter must clearly describe the duties to be performed by the alien."  8 C.F.R. § 204.5(j)(5)

20.      The INA defines "managerial capacity" as:

(A) an assignment within an organization in which the employee primarily—

(i) manages the organization, or a department, subdivision, function, or component of the organization;

(ii) supervises and controls the work of other supervisory, professional, or managerial employees, or manages an essential function within the organization, or a department or subdivision of the organization;

(iii) if another employee or other employees are directly supervised, has the authority to hire and fire or recommend those as well as other personnel actions (such as promotion and leave authorization) or, if no other employee is directly supervised, functions at a senior level within the organizational hierarchy or with respect to the function managed; and

(iv) exercises discretion over the day-to-day operations of the activity or function for which the employee has authority.

8 U.S.C. § 1101(a)(44)(A); *see also* 8 C.F.R. § 204.5(j)(2)(C).

21.     "The definition of 'managerial capacity' allows for both 'personnel managers' and 'functional managers.'  Personnel managers must primarily supervise and control the work of other supervisory, professional, or managerial employees, whereas function managers must primarily manage an essential function within the organization." *Matter of G-*, *Inc.*, Adopted Decision 2017-05 at *3.  "A function manager may also directly oversee personnel, if incidental to managing the function." *Id.*

22.     USCIS has decided that "to establish that the beneficiary will be employed in a managerial capacity as a 'function manager' the petitioner must demonstrate that: (1) the function is a clearly defined activity; (2) the function is 'essential,' i.e., core to the organization; (3) the beneficiary will primarily *manage*, as opposed to *perform*, the function; (4) the beneficiary will act as a senior level within the organizational hierarchy or with respect to the function managed; and (5) the beneficiary will exercise discretion over the function's day-to-day operations." *Matter of G-, Inc.*, Adopted Decision 2017-05 at *4.

23.     Subpart (B) of 8 U.S.C. § 1101(a)(44) defines the term "executive capacity" as:

> (B) . . . an assignment within an organization in which the employee primarily—
>
> (i) directs the management of the organization or a major component or function of the organization;
>
> (ii) establishes the goals and policies of the organization, component, or function;
>
> (iii) exercises wide latitude in discretionary decision-making; and
>
> (iv) receives only general supervision or direction from higher level executives, the board of directors, or stockholders of the organization.

8 U.S.C. § 1101(a)(44)(B); 8 C.F.R. § 204.5(j)(2)(C).

24.     To meet the statutory and regulatory threshold, the petitioner must establish: (i) that the beneficiary performs the high-level tasks contained in the definitions; and (ii) that such tasks will be the beneficiary's primary responsibilities.

25.     If staffing levels are used as a factor in determining whether an individual is acting in a managerial or executive capacity, USCIS must consider the reasonable needs of the organization, component, or function in light of the overall purpose and stage of development of the organization, component, or function.  8 U.S.C. § 1101(a)(44)(C).

26.     An individual shall not be considered to be acting in a managerial or executive capacity (as previously defined) merely on the basis of the number of employees that the individual supervises or has supervised or directs or has directed.  8 U.S.C. § 1101(a)(44).

27.     The statutory definition for "managerial capacity" and "executive capacity" at 8 U.S.C. § 1101(a)(44) applies equally to both multinational managers and executives seeking an immigrant visa and L-1A non-immigrant managers and executives seeking temporary employment in the United States.  *Matter of G-*, *Inc.*, Adopted Decision 2017-05 at *2.

## FACTUAL BACKGROUND

28.     On May 31, 2017, LSS Software filed a Form I-140, Immigrant Petition for Alien Worker, to classify Mr. Larsen, a national of Norway and a citizen of both

10

Norway and Canada, as an employment-based immigrant in a multinational executive or managerial position. A complete copy of the Initial Petition is attached as **Exhibit A.**

29.     LSS Software had lawfully employed Mr. Larsen as a L1-A manager or executive since 2011. **Exhibit A.**

30.     On May 25, 2018, USCIS issued a Request for Evidence ("RFE") seeking further documentation that; (1) LSS Software offered Mr. Larsen a permanent position as a multinational managerial or executive; and (2) Mr. Larsen held the same position abroad for at least one year in the preceding three years. **Exhibit B.**

31.     USCIS specifically requested LSS Software to provide:

      a. a letter from an authorized official . . . clearly describing the beneficiary's actual duties including specific daily tasks that were involved with the completion of each duty and the percentage of time spent on each duty;

      b. a list of employees (and individual contractors) in the beneficiary's immediate division, department or team with a summary of their job duties;

      c. and a description of products and services with an explanation of who performs the tasks and tasks related to goal-setting and policy-making.

32.     USCIS further stated that the duties Mr. Larsen performed for Lean Software in Canada could not be considered for the expected position with LSS Software. **Exhibit B.**

33.     USCIS admittedly failed to appreciate how Mr. Larsen could simultaneously control employees of Lean Software and LSS Software. **Exhibit B.**

34.    USCIS recommended that LSS Software provide:

      a.   a timeline and schedules to establish the amount of time Mr. Larsen
          spends completing duties for each location.
      b.   evidence regarding who is in charge of the parent and subsidiary
          company when Mr. Larsen is not on site; and
      c.   the employee who would run Lean Software if Mr. Larsen immigrated
          to the United States.

**Exhibit B.**

35.    On August 14, 2018, LSS Software submitted a volume of evidence directly

responding to USCIS.  **Exhibit C.**  This evidence included: (1) a detailed letter

from Mr. Larsen describing his daily and weekly tasks that were involved with the

completion of each duty and the percentage of time spent on each duty; (2) an

updated organization chart of LSS Software and Lean Software with a summary of

the employee's job duties, location of employment and wages; (3) an organization

chart of the combined companies; and (4) updated financial and tax information for

the companies related to the sales of its enterprise software products with

explanations as to which employees remained responsible for goal-setting and

policy-making.  **Exhibit C.**

36.    LSS Software was incorporated in Delaware in 2010, and has remained

headquartered in Dayton, Ohio.  It operates as a wholly-owned subsidiary of its

Canadian-based parent company, Lean Software.  **Exhibit A.**  Mr. Larsen founded

Lean Software in 2002, after providing financial backing to create the original

version of the company's proprietary software product AdjustmentHub™.  **Exhibit**

**C.** Together, the cross-border companies are referred to as Lean Industries and function to develop and deliver its propriety enterprise software to multinational banks and financial institutions across North America and Europe. **Exhibit A & C.**

37. The parent company primarily focuses on research and continued development of AdjustmentHub™. The U.S.-based subsidiary provides customer support along with financial planning and analysis. **Exhibit C.**

38. As of December 31, 2017, the combined enterprise employed 39 individuals (15 in the United States, 22 in Canada, and 2 in Portugal) and generated approximately $5.8 million in software sales. It paid $2.8 million in wages; $764,000 in software expenses; more than $536,000 in other administrative and professional expenses. **Exhibit C.**

39. Mr. Larsen has always been employed in the top executive position, Chief Executive Officer and President, of each cross-border company, which is reflected on the detailed organizational charts for the respective entities and the combined organizational chart. **Exhibit C.**

40. The combined chart reflects that five individuals in senior management positions report to Mr. Larson: (1) the Manager, Financial & Operational Services; (2) the Vice President, Product Development; (3) the Director, Network Technologies; (4) the Vice President, Sales and Delivery; and (5) Project

Administrator & Systems Engineer. The Vice President, Sales and Delivery, and the Project Administrator & Systems Engineer earn $144,000 per annum and $75,000 per annum while advancing the core finance-based and client-service based activities in the United States; the other three top-tier management employees advance the product development and management of its core activities in Canada earning comparable wages. **Exhibit C.**

41.     The organizational chart for U.S.-based LSS Software includes a third-tier of four managerial personnel and approximately a dozen more employees who perform the assigned tasks as assigned from management. A more vertical structure exists within Lean Software, though the chain-of-command remains identical. Whether based in Canada or the United States, senior management, junior management, and non-management personnel report to and the follow the upward chain-of-command that ends with the CEO and President, Bjorn Larsen.

**Exhibit C.**

42.     Mr. Larsen primarily, if not entirely, functions as an executive or manager overseeing the senior, managerial personnel who advance Lean Industries' core activities. In his role as President and CEO, Mr. Larsen:

    a. manages all personnel decisions within each entity via weekly, monthly, and annual meetings;
    b. bears the ultimate responsibility for setting and verifying the annual budget, financial reports, and tax reporting;
    c. holds absolute authority to bind the company in legal and business contracts;

14

      d. and holds a majority of each company's outstanding stock certificates, and thus bears the utmost risk to the company's financial well-being and continued success. **Exhibit C.**

43. USCIS previously understood that Mr. Larsen's position at LSS Software represents a paradigm example of a multinational executive or manager via its repeated approvals of his L1-A status. **Exhibit C.**

44. In the day-to-day role as Chief Executive Officer and President for a multi-million-dollar global business, Mr. Larsen's typical responsibilities include the highest senior-level oversight and functional management of clients and software sales through direct supervision of department heads and supervisor-level managers who, in turn, oversee employees tasked with the day-to-day operations of the Canadian-based and U.S.-based entities. Mr. Larsen manages multiple, if not all, essential functional components of the combined Lean Industries; he does not perform tasks that are not supervisory, managerial, or executive in nature. **Exhibit C.**

45. In his letters to USCIS, Mr. Larsen provided a weekly breakdown of his managerial and executive responsibilities divided into percentages and hours worked in a 40-hour workweek. **Exhibit A & C.**

46. To properly oversee "all operations and business activities," Mr. Larsen specifically detailed that he spends 20% of the workweek "with senior management ... in regular in-person and virtual meetings to discuss and develop

long and short-term business strategies and define objectives to achieving corporate goals." **Exhibit C.**

47.     As the individual solely responsible for all personnel decisions and sole creator of its revenue-generating software product, Mr. Larsen spends an additional 20% of the workweek holding meetings with all staff to review product developments and make necessary personnel decisions.  **Exhibit C.**

48.     As the leader of a global business serving billion-dollar financial institutions, Mr. Larsen spends 20% of time focused on direct contact with "high-level clients and business partners," including managing the price and legal terms for software and servicing contracts, defining the scope of such sales via oversight of the Vice President of Sales.  **Exhibit C.**

49.     Approximately 15% of Mr. Larsen's workweek is spent on "review[ing] key documents prepared by [his] team and professional relationships (such as independent legal and tax advisors) on behalf of the company's operations in North America." **Exhibit C.**

50.     Another 10% of the Mr. Larsen's workweek is spent on mentoring staff and supervisory personnel on quality control to "troubleshoot roadblocks and potential issues that may arise as [the company] scales the business." **Exhibit C.**

51.     To maintain his leading role as an industry leader, Mr. Larsen specifically spends the last 10% to 15% of the workweek on continued learning regarding

"industry trends" "corporate legality," and "business ethics" and taking corrective action for Lean Industries when necessary. **Exhibit C.**

52.     Mr. Larsen's personal statement to USCIS verified that he was "not involved in the day-to-day software development, day-to-day customer support and business analysis, development projects, sales, marketing, and lower-level administrative tasks."  "Rather," he advanced the core functions through his team of "Senior Level managers . . . **100% of [his] time is spent on executive oversight and direction of Lean Industries.**"  **Exhibit C. (emphasis in original**).

53.     On December 20, 2018, USCIS issued a decision denying LSS Software's petition for two reasons initially identified in its May 25, 2018 RFE: (1) the record evidence did not establish by a preponderance of the evidence that LSS Software would employ Mr. Larsen as a multinational executive or manager; and (2) Mr. Larsen had not worked in the same capacity abroad for the parent company for one year in the preceding three years.  **Exhibit D.**

54.     USCIS did not explain why the position offered to Mr. Larsen did not qualify as a multinational manager.  **Exhibit D.**

55.     It solely considered, but remained unpersuaded, that LSS Software sought to employ Mr. Larsen as an executive and he had been employed in the same capacity abroad.  **Exhibit D.**

56.     Although it requested detailed documentation, including lists of employees and the duties assigned, USCIS concentrated on the letter Mr. Larsen submitted. **Exhibit D.**

57.     USCIS concluded that the letter did "not include specific duties to be performed" and referred to Mr. Larsen's recitation of his duties as "vague and generalized," "of limited evidentiary value," and "not persuasive" regarding whether LSS Software sought to employ Mr. Larsen as a multinational executive. **Exhibit D.**

58.     USCIS faulted LSS Software for failing to include "the types of goals to be completed," and thus had not "provided insight into the day-to-day tasks to be performed."  **Exhibit D.**

59.     USCIS reached the same conclusion with regard to Mr. Larsen's role in overseeing and collaborating with the management team, acting as the final decision-maker on all employee relations matters, and as the "project manager." **Exhibit D.**

60.     USCIS further found Mr. Larsen's detailed efforts to "analyze problematic situations" and work with "customers, suppliers and vendors" did not qualify as executive in nature.  **Exhibit D.**

61.     USCIS also believed that the time Mr. Larsen spent on continued learning did not "appear to be qualifying duties."  **Exhibit D.**

62.     USCIS faulted LSS Software for failing to delineate the time Mr. Larsen spent between the parent and subsidiary companies, notwithstanding the evidence and explanations offered to demonstrate the inseparable nature of Lean Industries. **Exhibit D.**

63.     "Despite holding the position of CEO," USCIS remained "unconvinced" that the individual employed as CEO and President of LSS Software would primarily act as an executive; it did not consider whether the duties of the position qualified as a multinational manager.  **Exhibit D.**

64.     As a final matter, USCIS concluded that Mr. Larsen had not served in the same executive capacity for Lean Software abroad in Canada for one year in the preceding three-year period.  **Exhibit D.**

65.     Although he founded the company in Canada and led the Canadian company through its growth phases since inception, held L1-A status provided by the USCIS as a manager or executive since 2011, and created the companies' chief million-dollar making product, USCIS found that in the absence of a more detailed breakdown of his duties on both sides of the U.S.-Canada border, the evidence failed to demonstrate that Mr. Larsen served in an executive manner that included "high-level responsibilities" on behalf of the multi-million dollar company. **Exhibit D.**

## STATEMENT OF CLAIMS

### Count One:
### Violation of the Administrative Procedure Act, 5 U.S.C. § 701, *et. seq.*, Where the Defendants Failed to Consider that Plaintiff Intended to Permanently Employ the Beneficiary as a Manager

66.     Plaintiff re-alleges and incorporates by reference herein all of the allegations set forth above.

67.     The APA empowers this Court to set aside a final agency action where, as here, the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

68.     "While judicial review of agency decisions is highly deferential, it is not without teeth." *Raj & Co. v. U.S Citizenship & Immigration Servs.*, 85 F. Supp. 3d 1241, 1248 (W.D. Wash. 2015).  An arbitrary and capricious determination results where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *NRDC v. United States EPA*, 658 F.3d 200, 215 (2d Cir. 2011), *quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856 (1983).

69.     USCIS' decision must reflect that it "considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its

action." *Noroozi v. Napolitano*, No. 14 cv 2012 (PAE), 905 F. Supp. 2d 535, 541 (S.D.N.Y. 2012), *citing J. Andrew Lange, Inc. v. FAA*, 208 F.3d 389, 391 (2d Cir. 2000).

70.     USCIS' December 20, 2018, decision does not meet these standards, and thus is unlawful and should be set aside. *Id.*

71.     USCIS entirely failed to discuss or otherwise demonstrate that it considered all the material evidence. In particular, it never considered whether the position offered to Mr. Larsen qualified him as a multinational manager, either a functional manager or personnel manager. **Exhibit D.**

72.     In 2017, USCIS issued its precedential decision in *Matter of G-, Inc.*, Adopted Decision 2017-05 (AAO Nov. 8, 2017), which set forth the requirements for a position to qualify as a multinational "functional manager" under 8 U.S.C. § 1153(b)(1)(C).

73.     In its decision, USCIS affirmed that a managerial position includes employees who act as a "function manager," which includes any employee who:

> a. acts at a senior level within the organizational hierarchy or with respect to the function managed;
>
> b. exercises discretion over the function's day-to-day operations;
>
> c. primarily manages, as opposed to perform, the function;
>
> d. the function is "essential" meaning it is core to the organization; and
>
> e. the function is a clearly defined activity.

*Matter of G-, Inc.*, Adopted Decision 2017-05 at *3-4.

74.     The position of "function manager" does not preclude a qualifying position as a "personnel manager," which refer to those who primarily supervise and control the work of other supervisory, professional, or managerial employees. *Matter of G-, Inc.*, Adopted Decision 2017-05 at *3-4.

75.     The record evidence demonstrates that LSS Software intended to permanently employ -- and Lean Industries had employed -- Mr. Larsen in the top executive position working in multiple managerial capacities as a functional manager and personnel manager. **Exhibit A & C.**

76.     USCIS never considered these issues, ignored its binding decision in *Matter of G-, Inc.,* misapprehended the record evidence, and reached in arbitrary, capricious, and unlawful decision in this case. **Exhibit D.**

### Count Two:
### Violation of the Administrative Procedure Act, 5 U.S.C. § 701, et. seq., as the Defendants Failed to Consider the Cumulative Evidence That Plaintiff Intended to Permanently Employ the Beneficiary as a Manager or Executive

77.     Plaintiff re-alleges and incorporates by reference herein all of the allegations set forth above.

78.     In denying Plaintiff's immigrant petition, USCIS failed to consider and weigh the evidence in context and as a whole as required under agency precedent. *See Matter of Z-A-*, Adopted Decision 2016-02 at *4 (AAO April 14, 2016) (when determining whether a beneficiary's job duties will be primarily managerial,

USCIS "must" consider the "totality of the record and weigh all relevant factors");
**Exhibit D.**

79.     USCIS' decision demonstrates a failure to consider the evidence as a whole
and the relevant factors including: the nature and scope of the petitioner's business;
the petitioner's organizational structure, staffing levels, and the beneficiary's
position within the petitioner's organization; the scope of the beneficiary's
authority; the work performed by other staff within the petitioner's organization,
including whether those employees relieve the beneficiary from performing
operational and administrative duties; and any other factors that will contribute to
understanding a beneficiary's actual duties and role in the business. *See Matter of*
*Z-A-*, Adopted Decision at *4; **Exhibit D.**

80.     Despite complying with USCIS' request for a detailed organizational
breakdown of the Plaintiff's employees, wages, and the chain of command,
USCIS' decision fails to reflect that it considered the detailed evidence LSS
Software provided.  **Exhibit A, C, & D.**  Rather, its decision reflects that it
narrowly concentrated on selected portions of the beneficiary's statement and,
failed to consider the statements in context of the entire detailed descriptions of the
business and his duties and in context of the other evidence in record.  **Exhibit D.**

81.     Without questioning the credibility of the evidence presented, USCIS simply
concluded in cursory fashion that the record did not demonstrate, by a

preponderance of the evidence, the beneficiary had worked or would work in an executive position.  **Exhibit D.**  In doing so, it cast aside its prior, repeated conclusions to the contrary without a developed explanation.  **Id.**

82.     USCIS abused its discretion in failing to address the material evidence that unlawfully infected its stated basis for denying the petition.  USCIS' entire failure to consider important aspects of the evidence and its misapprehension of the evidence considered resulted in reasoning that runs counter to the evidence before the agency and is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  **Exhibit D.**

**Count Three:**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 701, et. seq., as the Defendants Irrational Result Contravenes the INA, the Regulations, and Congressional Intent**

83.     Plaintiff re-alleges and incorporates by reference herein all of the allegations set forth above.

84.     The beneficiary founded LSS Software in 2010, and its parent company, Lean Software in 2002.  **Exhibit A & C.**

85.     Given the nature of its concentrated, institutional client-base and his breadth of knowledge of its proprietary product, Mr. Larsen made the business-decision to operate two cross-border entities: one focused on research and development; and one focused on customer service and financial planning and analysis.  **Exhibit C.**

24

86.     USCIS unlawfully imposed an unreachable burden upon Plaintiff by requiring it to set forth the daily physical location of Mr. Larsen as he managed and executed the core activities of these entities.  **Exhibit D.**

87.     Neither the INA, nor the regulations, prohibit a multinational manager or executive from acting in such a capacity while off-site or abroad.  8 U.S.C. § 1153(b)(1)(C); 8 U.S.C. § 1101(a)(44)(A)-(B); 8 C.F.R. § 204.5(j), *et. seq.*

88.     Neither the INA, nor the regulations, prohibit a multinational manager or executive from performing managerial or executive duties on behalf of a parent company and a subsidiary.  *Id.*

89.     USCIS' analysis and out-of-touch reasoning reflects a fundamental misunderstanding of the nature of Plaintiff's business, the business of its parent, and the managerial and executive roles that Mr. Larsen holds within each entity and the entity as a whole.  **Exhibit D.**

90.     USCIS conclusion that Mr. Larsen is not a multinational executive or manager contravenes Congress' intent in creating the EB-1(C) classification: "to facilitate the transfer of key managers or executives within a multinational organization."  *Matter of G-, Inc.*, Adopted Decision 2017-05 at *3.

91.     Lean Industries, and its component parts, represent a quintessential multinational organization and its Executive and President, Mr. Larsen, is the quintessential key manager and executive within the multinational organization.

He is the paradigm example of the key employee for the EB-1(C) immigrant classification.  As of December 31, 2017, Lean Industries employed 39 individuals (15 in the United States, 22 in Canada, and 2 in Portugal) and generated approximately $5.8 million in sales of its software.  **Exhibit C.**

92.  USCIS' contrary conclusion contravenes the INA, the regulations, and Congressional intent, and thus should be set aside.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff LSS Software Holdings, Inc., respectfully requests the Court grant the following relief:

A.  Assume jurisdiction over this matter;

B.  Hold unlawful and set aside the USCIS' unlawful, arbitrary, and capricious decision denying Plaintiff's I-140 immigrant petition on behalf of Mr. Larsen on the ground that the decision was arbitrary and capricious;

C.  Enter an order requiring the USCIS to approve Plaintiff's petition in favor of Mr. Larsen;

D.  Award Plaintiff, attorneys' fees, costs, and interest as permitted by law; and

    E.      Grant such further and other relief as may be just and proper.

Respectfully submitted,

*/s/Mechelle Zarou*
Mechelle Zarou (0073028)
SHUMAKER, LOOP & KENDRICK, LLP
North Courthouse Square
1000 Jackson Street
Toledo, Ohio 43604
Telephone: (419) 241-9000
Fax: (419) 241-6894
E-Mail mzarou@slk-law.com


LSS Software Holdings Inc., by their attorneys,


/s/Jesse M. Bless
Jesse M. Bless (MA BBO # 660713)
JEFF GOLDMAN IMMIGRATION LLP
125 Washington Street, Ste. 204
Salem, MA 01970
(781) 704-3897
Jesse@jeffgoldmanimmigration.com


Dated: March 21, 2019       *Moving for Pro Hac Vice Admission*

## **CERTFICATE OF COMPLIANCE**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

LSS Software Holdings Inc., by their attorneys,

/s/Jesse M. Bless
Jesse M. Bless (MA BBO # 660713)
JEFF GOLDMAN IMMIGRATION LLP
125 Washington Street, Ste. 204
Salem, MA 01970
(781) 704-3897
Jesse@jeffgoldmanimmigration.com

Dated: March 21, 2019                    *Moving for Pro Hac Vice Admission

## **LIST OF EXHIBITS**

Exhibit A:    Copy of the Form I-140 Petition

Exhibit B:    Copy of the RFE

Exhibit C:    Copy of the Response

Exhibit D:    Copy of the Final Decision